# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ABOUFAZL BAYATFSHAR, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 11-450 (RC) |
| | : | | |
| v. | : | Re Document No.: | 40 |
| | : | | |
| ARINC, Inc., *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### DENYING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

The plaintiff is a former Washington Metropolitan Area Transit Authority ("WMATA") engineer who worked on projects with outside contractors. He alleges that Peter Kaputsos, an employee of one of these contractors, continually harassed, threatened, and maligned him with his superiors, engaging in defamation, and tortious interference with contract resulting in a constructive discharge. The plaintiff has brought this action against Mr. Kaputsos and his employer, ARINC, Inc. The defendants have filed a motion for summary judgment. Because a reasonable factfinder could conclude that Mr. Kaputsos sufficiently disparaged the plaintiff to cause him to be stripped of his duties, and that he thus intentionally procured a breach of his employment contract and caused his constructive discharge, the motion is denied as to the tortious interference and constructive discharge claim. Further, because the plaintiff was unaware, prior to 2010, of certain defamatory statements capable of causing special harm, such statements and the resulting defamation claim are not time-barred. Finally, because a reasonable factfinder could conclude that Mr. Kaputsos made statements that tended to injure the plaintiff in his trade or profession, the motion as to the defamation claim is denied.

1

## II. FACTUAL & PROCEDURAL BACKGROUND

The plaintiff began working for WMATA in 1999 as an independent contractor employed by Raytheon Company. Defs.' Stmt. of Mat. Facts ¶ 1. In 2003, he became a WMATA employee, as a construction engineer. *Id.* ¶ 2. His assignments included working on the Integrated Intercommunications System ("Intercom"), and on the Carrier Transportation and Fiber Optic System ("CTS/FOS"). *Id.* ¶ 3. Kaputsos and ARINC, Inc. were contractors or subcontractors who worked on these two WMATA contracts. *Id.* ¶ 4. On the Intercom project, ARINC, Inc. was a subcontractor to Ramex, who had a contract with WMATA. *Id.* ¶ 5. Some of the plaintiff's duties included monitoring contractors' activities. *Id.* ¶ 6; Pl.'s Opp'n at 6. Only the project manager or contracting officer, as opposed to the construction engineer, was authorized to make changes to contracts on behalf of WMATA. *Id.* ¶ 9. The plaintiff's direct supervisor was the project manager, Mr. Sarj Akhund, and his second-level supervisor was Mr. Beck Pak, the senior project manager of systems. *Id.* ¶ 11. Mr. Akhund indicated to Mr. Pak that the plaintiff would occasionally agree to one thing and then later take a different position. *Id.* ¶ 23. Mr. Akhund also told Mr. Pak that the plaintiff was causing problems on more than one project by making decisions outside of his authority, which Mr. Pak discussed with the plaintiff. *Id.* ¶ 24.

Mr. Kaputsos worked on the CTS/FOS contract and carry-on, the Intercom contract, and on the Remote Terminal Unit ("RTU") replacement, all of which were contracts with WMATA. *Id.* ¶ 32. His duties as project manager on these contracts included interfacing with the WMATA project manager, managing his staff, and in-house reporting to his management. *Id.* ¶ 33. For the Intercom project, he also had to report to Ramex. *Id.* ¶ 34. For the RTU project, he was the manager overseeing his employer's project managers, such that these project managers who

worked with WMATA were under his direct supervision. *Id.* ¶ 35. When he worked on some contracts, including the CTS/FOS contract, it was his job to communicate with Mr. Akhund. *Id.* ¶ 36. If issues arose regarding the scope of the plaintiff's exercise of authority on a contract, Mr. Kaputsos was responsible for communicating these issues to the plaintiff's supervisor at WMATA. *Id.* ¶ 37. WMATA expected its contractors' project managers, such as Mr. Kaputsos, to communicate such concerns to it. *Id.* ¶ 38.

The plaintiff was a conduit for information on serious issues involving these projects, and was responsible for passing information to the project manager for decisions. *Id.* ¶ 41. On the CTS/FOS contract, Mr. Akhund was designated as the WMATA point of contact, with the authority to make changes. *Id.* ¶ 50. The plaintiff claims that Mr. Kaputsos continually threatened, harassed, and disparaged him to the plaintiff's superiors. Am. Compl. ¶ 9. The plaintiff further claims that he was thereafter removed from email correspondence and meeting lists—essentially removed altogether—from several of the projects in which he was directly involved. *Id.* ¶ 11. Ultimately, the plaintiff claims that the harassment made him sick, forcing him to take leave, and resulting in a constructive discharge. *Id.* ¶¶ 25, 28.

The plaintiff has filed this action alleging that Mr. Kaputsos repeatedly threatened and harassed him, and that he made negative comments about the plaintiff to the plaintiff's superiors. The plaintiff claims that Mr. Kaputsos engaged in tortious interference with the plaintiff's employment contract and defamation. The defendants have filed a motion for summary judgment. The court now turns to the parties' arguments and the applicable legal standards.

## III. ANALYSIS

### A. Legal Standard for a Rule 56 Motion for Summary Judgment

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party bears the initial responsibility of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. *Id.* at 323; FED. R. CIV. P. 56(c)(1)(A) (noting that the movant may cite to "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials"). In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine issue that is suitable for trial. *Celotex*, 477 U.S. at 324. On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## B. The Plaintiff's Tortious Interference and Constructive Discharge Claim[1]

According to the defendants, there is no merit to the plaintiff's claim that Mr. Kaputsos tortiously interfered with the plaintiff's employment contract and caused him to be constructively discharged. Defs.' MSJ at 6. The defendants state there is no indication that the plaintiff's employment agreement was breached, or that Mr. Kaputsos caused him to change his relationship with WMATA. *Id.* The defendants contend that instead of being constructively discharged, the plaintiff voluntarily took sick leave and left due to an alleged disability. *Id.*

The plaintiff responds that ARINC and Ramex submitted several improper claims, and that the plaintiff had the unpleasant task of bringing these entities together to resolve such issues, which was met with outright hostility from Mr. Kaputsos. Pl.'s Opp'n to MSJ at 3. The plaintiff states that Mr. Kaputsos failed to take responsibility for his employer's failures. *Id.* Instead, the plaintiff argues, Mr. Kaputsos maligned him in emails to the plaintiff's supervisors and lobbied for his termination. *Id.* at 4. The plaintiff contends that this led his supervisors to announce during a 2007 meeting that the plaintiff would no longer be communicating with contractors, which the plaintiff argues "effectively stripped [him] of all [of] his duties." *Id.* The plaintiff thus claims that because Mr. Kaputsos tortiously interfered with the plaintiff's contract by effectively lobbying for his removal, Mr. Kaputsos caused the plaintiff to be stripped of his duties, or constructively discharged. *Id.*

---

[1] The defendants contend that Mr. Kaputsos works for ARINC, and not for Aeronautical Radio, which is a wholly owned subsidiary of ARINC. Defs.' MSJ at 4. The defendants thus claim that because Mr. Kaputsos has no relationship with Aeronautical Radio, summary judgment should be granted in Aeronautical Radio's favor. *Id.* at 4-5. At the time that the defendants filed their motion, only Mr. Kaputsos and Aeronautical Radio were defendants in this matter, whereas ARINC was not. Subsequently, this Court stated in its March 29, 2013 memorandum opinion that when the plaintiff had brought this action against Mr. Kaputsos and Aeronautical Radio, it had made an unknowing mistake in failing to name ARINC as a defendant. Mem. Op. [Dckt. #53] at 6. This Court thus ordered that ARINC be substituted as a defendant for Aeronautical Radio. *Id.* at 12. Because Aeronautical Radio is no longer a party in this case, the defendants' argument to grant summary judgment in its favor is moot. The plaintiffs' claims against ARINC are addressed below.

Tortious interference with contractual relations arises when a defendant interferes with a contract between the plaintiff and some third party. *Wiggins v. Hitchens*, 853 F. Supp. 505, 512 (D.D.C. 1994) (internal citations omitted). In order to recover for intentional interference with contractual relations, the plaintiff must prove four elements: "(1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach." *Id.* (internal citations omitted). Intentional procurement of a breach involves conduct such as "libel, slander, physical coercion, fraud, misrepresentation, or disparagement." *Chambliss v. Nat'l R.R. Passenger Corp.*, 2007 WL 581900, at *27 (D.D.C. 2007) (internal citation omitted).

Further, "constructive discharge occurs when the employer deliberately makes working conditions intolerable and drives the employee to an [sic] involuntar[ily] quit." *Atlantic Richfield Co. v. Dist. of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1101 (D.C. 1986). There is no requirement that the employer intend to force the employee to leave. *Id.* In determining whether constructive discharge occurred, "courts have focused on the existence of aggravating conditions in the workplace which would lead a reasonable person to resign." *Id.*; *Sisay v. Greyhound Lines, Inc.*, 34 F. Supp. 2d 59, 65 (D.D.C. 1998). In addition, when an employee contracts to fill a particular position, any material change in duties could constitute a constructive discharge. *Brock v. Mutual Reports, Inc.*, 397 A.2d 149, 152 (D.C. 1979). If an employee's duties are changed substantially, such as by having his managerial responsibilities removed or by suffering a demotion, even if his salary does not change, it can be considered a constructive discharge. *Id.* The employee bears the burden of demonstrating that the employer's actions comprised such a discharge. *Id.*

There is a dispute of fact as to whether Mr. Kaputsos intentionally procured a breach of the plaintiff's employment contract with WMATA and caused him to be constructively discharged. Mr. Kaputsos sent various emails to Mr. Akhund, the plaintiff's supervisor at WMATA, complaining about him. In these emails, Mr. Kaputsos stated that the plaintiff had sent about fifty emails over the span of two days, and that his emails should be screened. Defs.' MSJ, Ex. F at 17. Mr. Kaputsos further claimed that the plaintiff's "word[,] as proven time and time again, [was] not to be trusted," *id.* at 18, and that the plaintiff "act[ed] on his own behalf, ignoring protocol and not adhering to anything that was previously agreed upon," *id.* at 33. Mr. Kaputsos was "perplexed as to why [the plaintiff could] not be controlled and brought in line with [their respective employers'] agendas, *id.* at 33.

Mr. Kaputsos also stated that one of his subcontractors' employees indicated that they could not "trust [the plaintiff] not to stab them in the back, [because he would] tell[] them one thing then contradict[] it in the next email." *Id.* at 35. Mr. Kaputsos refused to meet with the plaintiff individually because he was "incapable of being objective and fair," *id.* at 22, and noted that he was "at a total loss for working with [the plaintiff]," *id.* at 25. Mr. Kaputsos claimed that the plaintiff was "causing major problems on multiple projects," attempting to "bully and impose his will," and that he was "not being reined in or controlled." *Id.* at 35. Mr. Kaputsos further stated that "WMATA [should] get this under control or [ARINC would] not be able to continue," that "[t]his ha[d] been going on for way too long," that "[e]nough [wa]s enough," that Mr. Kaputsos would "escalate if necessary," and that "the common denominator should be obvious." *Id.* at 22. Mr. Kaputsos claimed that the plaintiff wanted to "continue kicking" him and others, and that it was "long time past for [Mr. Akhund] to intervene." *Id.* at 17. Mr. Kaputsos requested "intervention" from the plaintiff's supervisors on more than one occasion, *id.* at 25,

7

and he ultimately noted that "the measures to date [had] been to be polite" and thus "ineffective," which warranted that the situation be "confronted and addressed," *id.* at 35.

In response to one of Mr. Kaputsos's emails, Mr. Akhund stated that he would try and speak with the plaintiff "yet again," that he had "already spoken with [Mr.] Ashook [Ramsaran,]" one of the plaintiff's superiors, and that he "[didn't] know what more" he could do. *Id.* at 24.  Mr. Akhund further noted that "something must be done and soon." *Id.*  The plaintiff testified during his deposition that Mr. Kaputsos maligning him led to his being "isolated in [his] responsibilities" and cut off from contact with contractors, such that he was taken off of some of the projects on which he had worked and was essentially stripped of his duties.  Defs.' MSJ, Ex. K, Bayatfshar Dep. at 30.*Id.* at 82.  It is undisputed that the plaintiff was hired as a project engineer, but that he began to assume more authority and managerial responsibility when he started working for his previous supervisor, Mr. Patel, who condoned such behavior.  Defs.' Stmt. of Mat. Facts, ¶¶ 6-11; Pl.'s Opp'n ¶ 6; Pak Dep. [Dckt. #43-2] at 59.  Even Mr. Kaputsos's emails suggest that the plaintiff was acting like the project manager, as opposed to merely like a project engineer, and that WMATA allowed him to do so.  Defs.' Mot., Ex. 8 at 35.

In light of this, there is not a dispute of fact as to whether the plaintiff's responsibilities were eventually diminished, because they were.  Rather, the question is whether the plaintiff's duties being reduced is of consequence here.  Because the plaintiff was hired as a project engineer, but then later assumed more authority and managerial responsibility that Mr. Patel did not negate, the issue is whether having such heightened authority and responsibility taken away was a breach of the plaintiff's employment contract, as he had not been promised such additional authority when initially hired.  More acutely, the question is whether Mr. Patel condoning the plaintiff's exercise of additional authority later on created a new contract between the plaintiff

8

and his employer, such that having that authority taken away would constitute a violation of that contract and possibly a constructive discharge.

"Many courts [have held] that terms of an employment contract . . . may be implied from the overall conduct and relationship of the parties," where such implied contracts "may arise from oral representations . . . the nature of the employment, the past practices of the particular employer, the course of dealing between the employer and the employee . . . and other circumstances that show the existence of contractual terms." MARK A. ROTHSTEIN ET AL., EMPLOYMENT LAW 533-34 (4th ed. 2009); *see also Ney v. City of Hoisington, Kansas*, 264 F. App'x 678, 685 (10th Cir. 2008) (same); *Myles v. Delta Air Lines, Inc.*, 89-C-1039W, 1990 WL 264720, at * (D. Utah Nov. 20, 1990) (stating that a plaintiff's employment relationship could be altered by an implied contract, and thereby potentially entitle a plaintiff to a breach of contract claim). Further, "whether an implied contract exists which creates a property interest in employment normally is a question of fact for the jury." *Koopman v. Water Dist. No. 1*, 972 F.2d 1160, 1164 (10th Cir.1992).

In this case, the plaintiff began to do things that only project managers are allowed to do, such as approving submittals from contractors, Akhund Dep. [Dckt. #40-5], approving or rejecting drawings, *id.* at 36-37, and making modifications to contracts, Pak Dep. at 16, 22, 26. Mr. Patel had not objected to or barred the plaintiff from doing these things. Pak Dep. [Dckt. #43-2] at 59. Indeed, he had allowed him leeway to do so. *Id.*

Based on these facts, a reasonable factfinder could conclude that Mr. Patel condoning and even allowing the plaintiff to assume such heightened authority modified the plaintiff's employment contract to include such responsibility. *Ferraro v. Bd. of Trustees of Labette Cnty. Med. Ctr.*, 106 F. Supp. 2d 1195, 1200 (D. Kan. 2000) aff'd, 28 F. App'x 899 (10th Cir. 2001)

9

(determining that whether the parties had an implied contract could be ascertained from several factors, including the parties' conduct from the commencement of the employment relationship, the nature of the employment, and the circumstances surrounding that relationship, and concluding that they had such contract). Moreover, a reasonable factfinder could conclude that the removal of these duties resulted in a constructive discharge. *Brock*, 397 A.2d at 152 (holding that when an employee was removed from his managerial responsibilities overseeing news operations, and was reassigned, at the same salary, to a regular news shift, that he suffered a constructive discharge because he was stripped of his prior managerial functions and left with "no more responsibility" than the newscasters that he had previously supervised).

Stated otherwise, because the plaintiff's previous job responsibilities, including managing others, were reduced, the plaintiff has presented enough evidence to leave the issue of whether he was constructively discharged as a question for the jury. *See Boyle v. HSBC Bank, USA, Inc.*, 2010 WL 235001, at *6 (S.D.N.Y. 2010) (holding that because the plaintiff no longer managed others and had other job responsibilities reduced, there was sufficient evidence for a reasonable factfinder to conclude that he had been constructively discharged); *Herrmann v. BCS Life Ins. Co.*, 1990 WL 250397, at *2 (N.D. Ill. 1990) ("a reasonable person might be constructively discharged by a dramatic decrease in responsibility"). Indeed, because the plaintiff's "duties changed substantially," a reasonable factfinder could find that the plaintiff's "new position was a significant demotion," and thus a constructive discharge. *Id.*; *Williams v. Johnson*, 870 F. Supp. 2d 158, 167 (determining that because the plaintiff's job responsibilities were removed and she was assigned to a different position, she suffered a constructive discharge); *Miller v. Butcher Distribs.*, 89 F.3d 265, 267 (5th Cir. 1996) ("a reduction in job responsibilities may constitute a

constructive discharge if a reasonable employee would feel compelled to resign") (citing *Barrow v. New Orleans S.S. Assoc.*, 10 F.3d 292 (5th Cir. 1994)).

Thus, because Mr. Kaputsos repeatedly told the plaintiff's supervisor that it was impossible to work with the plaintiff and that they should take action, coupled with the fact that the plaintiff was subsequently removed from some of his responsibilities, the plaintiff has offered enough evidence for a reasonable factfinder to conclude that Mr. Kaputsos sufficiently disparaged and maligned the plaintiff to cause him to be stripped of his duties, thereby effecting his constructive discharge and intentionally procuring a breach of his employment contract. *See Modis Inc. v. InfoTran Systems, Inc.*, 893 F. Supp. 2d 237, 241 (D.D.C. 2012) ("[t]o establish a claim of improper interference with contract or business relations, the plaintiff must demonstrate that the defendant engaged in conduct that is egregious[, such as] libel, slander . . . or disparagement) (internal quotation marks and citation omitted); *Intelsat U.S.A. Sales Corp. v. Juch-Tech, Inc.*, 2013 WL 1224893, at *11 (D.D.C. 2013); *Cf. Ulrich v. Exxon Co., U.S.A., a Div. of Exxon Corp.*, 824 F. Supp. 677, 688 (S.D.Tex. 1993) (determining that summary judgment should be granted for the defendants because the plaintiff provided no facts to support his claim that the defendants engaged in tortious interference of contract by intimidating, harassing, and disparaging him). The defendants' motion for summary judgment as to the plaintiff's tortious interference and constructive discharge claim is therefore denied.

### C. The Plaintiff's Defamation Claim

The defendants also refute the plaintiff's defamation claim, contending that it is barred by the statute of limitations. Defs.' MSJ at 12. Additionally, the defendants assert that Mr. Kaputsos's statements were not false statements, but rather, matters of opinion, and that to the extent that any of the opinions contained factual foundations, those foundations were true. *Id.*

11

Finally, the defendants argue that Mr. Kaputsos is entitled to qualified privilege for his statements. *Id.* The plaintiff responds that he filed the amended complaint within one year of discovering the defamatory emails, and that Mr. Kaputsos's statements were statements of fact, and not of opinion. Pl.'s Opp'n to MSJ at 26. The plaintiff also contends that the defendants are not entitled to qualified privilege because WMATA did not share the intent of the emails, which was to remove the plaintiff from his position. *Id.*

### 1. Statute of Limitations

Under D.C. CODE § 12-301(4), actions for libel or slander, namely defamation, may only be brought within one year of accrual. D.C. CODE § 12-301(4). Such actions typically begin to run when the defamatory statement is published. *Di Lella v. Univ. of Dist. Of Columbia*, 570 F. Supp. 2d 1, (D.C. 2008). But within the defamation context, the statute of limitations is tolled and begins to run when the plaintiff discovers or reasonably should have discovered the facts necessary to assert that claim. *Stith v. Chadbourne & Parke, LLP*, 160 F. Supp. 2d 1, 8 (D.D.C. 2001).

In his declaration, the plaintiff indicates that he filed a discrimination complaint with WMATA's Office of Civil Rights ("OCR"), which conducted an investigation, and that he subsequently filed a workers' compensation claim for the anxiety disorder that he had developed. Pl.'s Decl., [Dckt. #53] ¶¶ 3, 7. The plaintiff states that it was only when his workers' compensation attorney requested from the OCR its investigation file that the plaintiff first discovered Mr. Kaputsos's emails to the plaintiff's supervisors, in which he lobbied for the plaintiff to be reined in and even terminated. *Id.* This request for the OCR file was made in 2010; the plaintiff received the documents on June 4, 2010. Pl.'s Decl., ¶ 12. The plaintiff initiated an action in this Court on February 28, 2011. Applying the discovery rule, because he

12

filed suit within one year of discovering Mr. Kaputsos's allegedly defamatory statements, the plaintiff's defamation claims fall within the statute of limitations. *See Stith*, 160 F. Supp. 2d at 8.

The defendants contend that the claims are not timely because the plaintiff was aware before January of 2010 that Mr. Kaputsos had made negative comments about him. Defs.' Sur-Reply, [Dckt. #55] at 6. They cite to the fact that the plaintiff emailed Mr. Pak in 2008, asking for his help in halting Mr. Kaputsos's sidelining and threatening behavior. *Id.* at 7. But this refers to a request to assist the plaintiff in stopping Mr. Kaputsos from harassing the plaintiff, himself; there is no indication that the plaintiff was aware at that point of the repeated emails that Mr. Kaputsos had sent calling for the plaintiff's supervisors to intervene and rein him in. Further, the defendants claim that Mr. Kaputsos told the plaintiff in emails before 2010 that he had agreed to one thing, and had then done the opposite. *Id.* at 6. But the harassment of which the plaintiff was aware before 2010 was levied against the plaintiff directly, instead of involving publishing statements to third parties, as is required for a defamation claim. *See infra* at 13. The defendants argue that the plaintiff's supervisors were copied on some of these emails. Yet the emails that were sent to the plaintiff and that were copied to his supervisors did not feature any disparagement of the plaintiff, and instead only discussed the specifics of their current projects. Defs.' MSJ, Ex. F at 21-22. Thus, even as the plaintiff was aware of harassment before 2010, it did not appear to involve defamatory statements capable of causing special harm, *see infra* at 13, such as a push to his supervisors to alter his job duties. Consequently, Mr. Kaputsos's conduct that was revealed in the previously undisclosed emails is different in kind (not degree) from the conduct of which the plaintiff was previously aware.[2]

---

[2] Because of this distinction that prevents the plaintiff's old claims from being time-barred, the evidence at trial will be limited to the information that was previously undisclosed. Evidence of Mr. Kaputsos's harassment of which the plaintiff was previously aware will not be admissible at trial.

The defendants also reference a 2007 meeting in which Mr. Kaputsos accused the plaintiff of forging Mr. Akhund's signature on a piece of correspondence, and where he called for the plaintiff's termination. *Id.* But the plaintiff's discrimination complaint notes that Mr. Akhund had already stated during that meeting that he, himself, had signed that correspondence, Pl.'s Sur-Reply, Ex. B at 7; because Mr. Kaputsos's allegation was proven baseless in that very meeting, as the plaintiff puts forward, it does not appear that this incident would have given him notice of a continuous campaign to lobby his supervisors to remove him. Rather, Mr. Kaputsos's repeated appeals to the plaintiff's supervisors were revealed in his emails. Thus, because the defendants do not offer any further indication that the plaintiff was aware before June of 2010 that Mr. Kaputsos systemically appealed to the plaintiff's supervisors to remove his job duties, the plaintiff's defamation claims are timely.[3]

## 2. Defamation

With respect to the defendants' other arguments, a plaintiff claiming defamation must show: 1) that the defendant made a false and defamatory statement concerning the plaintiff; 2) that the defendant published the statement without privilege to a third party; 3) that the defendant's fault in publishing the statement amounted to at least negligence; and that 4) either the statement was actionable as a matter of law irrespective of special harm, or that its publication caused the plaintiff special harm. *Marshall v. Allison*, 2012 WL 6439889, at *6. A statement is defamatory "if it tends to injure [the] plaintiff in his trade, profession, or community

---

[3] The defendants also contend that the plaintiff's tortious interference claim is time-barred because the plaintiff was aware of Mr. Kaputsos's negative comments about him to his supervisors before 2010. Defs.' Sur-Reply at 9. Under District of Columbia law, a tortious interference claim begins to run when the plaintiff knows or through the exercise of due diligence should have known of the injury. *Dubois v. Wash. Mutual Bank*, 2010 WL 3463368, at *3 (D.D.C. 2010). Because the basis of the tortious interference claim is Mr. Kaputsos's emails to the plaintiff's supervisors lobbying for him to be reined in, this claim began to accrue in June of 2010, when the plaintiff discovered such emails. The plaintiff's tortious interference claim is therefore timely.

14

standing, or [to] lower him in the estimation of the community." *Howard Univ. v. Best*, 484 A.2d 958, 988 (D.C. 1984).

As noted above, the defendants contend that Mr. Kaputsos's statements were not false statements, but instead, matters of opinion. Defs.' MSJ at 12. Even if a statement is one of opinion, it is still actionable "if it has an explicit or implicit factual foundation," as this makes it "objectively verifiable." *Washington v. Smith*, 80 F.3d 555, 556 (D.C. Cir. 1996). Here, Mr. Kaputsos stated in emails to the plaintiff's supervisor that the plaintiff "act[ed] on his own behalf, ignoring protocol and not adhering to anything that was previously agreed upon," and that he would tell Mr. Kaputsos and others one thing, and then contradict it in a subsequent email. Defs.' MSJ, Ex. F at 33. Mr. Kaputsos also said at one point that the plaintiff had sent 50 emails in the previous two days, and that Mr. Kaputsos could understand very little about what he was trying to say. *Id.* at 17. Mr. Kaputsos indicated that there was "no rationalizing or satisfying [the plaintiff]," that he seemed to "ha[ve] his own agenda," and that it was "impossible to resolve anything in a reasonable manner to [the plaintiff's] satisfaction." *Id.* Mr. Kaputsos further claimed that the plaintiff could not be trusted not to stab others in the back, and that he was incapable of being objective and fair. *Id.* at 35.

There is thus a dispute of fact as to whether Mr. Kaputsos's statements have a factual foundation. The defendants contend that even if the statements have a factual foundation, they are shielded from liability because they are true. Defs.' MSJ at 15-16. The defendants have put forward evidence indicating that some of Mr. Kaputsos's statements are true, such as the plaintiff's supervisors testifying that he would indeed instruct or advise others to take one course, and then alter that stance later. *See* Pak Dep. at 22; Akhund Dep. at 36. Also, it is possible to infer from these supervisors' testimony that the plaintiff did not adhere to protocol when working

on projects, but the plaintiff has testified to the contrary. According to the plaintiff, ARINC and Ramex submitted several improper claims, and he had the difficult task of bringing these entities together to resolve such issues. Pl.'s Opp'n at 3; Pl.'s Dep. at 30. Further, even as the supervisors' testimony may lend credence to the argument that Mr. Kaputsos's statements had a factual foundation, they were not entirely unbiased when providing such testimony, as the plaintiff had filed a discrimination claim against them with the OCR. Thus, on the facts presented—particularly with regard to Mr. Kaputsos's statements that the plaintiff did not follow protocol and that it was impossible to resolve anything to his satisfaction—a reasonable factfinder could conclude that the defendant had made untrue statements that tended to injure the plaintiff in his trade or profession. *See Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1211 (D.C. 1991) (determining that a reasonable factfinder could find the statement that an employee "seemed detail oriented to the point of losing sight of the big picture" to be defamatory).

Finally, the defendants assert that Mr. Kaputsos's statements were protected by a qualified privilege. Defs.' MSJ at 18. In the employment context, an employer may enjoy a qualified privilege to make statements about an employee, unless the publication occurs outside of normal channels, is otherwise excessive, or is made with malice. *Tacka v. Georgetown Univ.*, 193 F. Supp. 2d 43, 51 (D.D.C. 2001). Here, Mr. Kaputsos was not the plaintiff's employer, and indeed did not even work for the same employer as him, and so his statements are not normally protected by a qualified privilege. The defendants did not address this in their reply brief, and may have thus abandoned their argument. Nonetheless, even as the plaintiff and Mr. Kaputsos did not have such a relationship, "persons who have shared interests are conditionally privileged to utter defamation on matters related to that interest." *Brown v. Collins*, 402 F.2d 209, 212 (D.C. Cir. 1968). Although Mr. Kaputsos and WMATA had a shared interest in completing

projects, Mr. Kaputsos and his employer had an interest in making a large profit, whereas WMATA had a competing interest of reducing costs. Indeed, the plaintiff has testified that Mr. Kaputsos's hostility resulted from the plaintiff's extensive efforts to pursue and protect WMATA's interest in projects. *See* Pl.'s Dep. at 30. Thus, because Mr. Kaputsos and the plaintiff's supervisors did not have a sufficient shared interest while working on WMATA's projects, Mr. Kaputsos's statements to them do not enjoy the qualified privilege. Accordingly, because there is a genuine dispute of material fact as to whether Mr. Kaputsos made untrue statements that would tend to injure the plaintiff, the defendants' motion is denied as to the plaintiff's defamation claim.

## IV. CONCLUSION

For the foregoing reasons, the Court denies the defendants' motion for summary judgment. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 20th day of August, 2013.

RUDOLPH CONTRERAS
United States District Judge